HOHMANN & MAURER MFG. CO. et al. v. CHARLES J. TAGLIABUE
MFG. CO. et al.

(Circuit Court, E. D. New York. November 26, 1909.)

**1. PATENTS (§ 119\*)—VALIDITY—CLAIMS EMBODYING DISTINCT INVENTIONS.**

A patent should not be held invalid because each of its claims might have been made the basis of a separate application, where all relate to improvements in a single instrument and may in a sense be considered elements of one construction.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 171; Dec. Dig. § 119.\*]

**2. PATENTS (§ 101\*)—CONSTRUCTION—USE OF GENERAL LANGUAGE.**

General language used in the claims of a patent relating to a limited field is merely general as to this limited field, and should not be held to render the claims indefinite because as a matter of literary composition the same language might be applied to some other field, if the public would not thereby be deceived.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 141; Dec. Dig. § 101.\*]

**3. PATENTS (§ 328\*)—INVENTION—THERMOMETERS.**

The Maurer patent, No. 525,915, for improvements in thermometers intended to register high temperatures, claim 4, which covers "a long stem thermometer having insulation applied to the stem of the mercury tube from the bulb to the thermometer head," in view of the prior art and its general language, is void for lack of invention.

In Equity. Suit by the Hohmann & Maurer Manufacturing Company and the Taylor Instruments Company against the Charles J. Tagliabue Manufacturing Company and Charles J. Tagliabue. Decree for defendants.

James C. Chapin, for complainants.

Briesen & Knauth (Hans v. Briesen, of counsel), for defendants.

CHATFIELD, District Judge. The complainant the Hohmann & Maurer Manufacturing Company is a corporation organized under the laws of the state of New York for the manufacture of scientific instruments. This company was the owner by assignment of certain letters patent No. 525,915, dated September 11, 1894, to Henry W. Maurer, an officer and stockholder in that corporation. At the time of obtaining the patent Maurer was in the instrument making business with a gentleman by the name of Hohmann. Their business was taken over and continued by the corporation until after the institution of this suit. In the fall of 1907, the Taylor Instruments Company, a corporation of Rochester, N. Y., also engaged in the manufacture of instruments, took over the Hohmann & Maurer Company and its patents, and was joined as a party herein by supplemental complaint; the pleadings being appropriately amended and the solicitors remaining the same.

The patent referred to by its terms relates to improvements in the construction of thermometers, some of these "improvements being more especially adapted for use on high-grade thermometers, that is, those designed for indicating high temperatures"; and the language

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the specifications just quoted serves for the purposes of this suit as a definition of high-grade thermometers. The portions of the patent, or rather the specific claims with which we have to do, relate only to instruments of that class.

Numerous motions have been made and several questions have arisen throughout the course of the action, which have generally been left for final hearing, and which are now unimportant, as to a certain extent they have related to the order of proof. Both sides have finally succeeded in getting upon the record the various portions of testimony about which these questions have arisen, even if the order of proof has been irregular. Before taking up the particular defenses, some statement of the invention claimed, and of the principles of physics and commercial objects thereto related, will be advantageous.

Thermometers as instruments for recording the temperature—that is, the intensity of heat, rather than its quantity—are universally known and used, and in the ordinary form are constructed of a glass tube with a bulb or receptacle for mercury at the lower end. The physical difficulty of drawing out a glass tube so as to make its cavity or bore of uniform caliber is apparent, and has been taken into account by every one, whether in experimentation or in practical manufacture. The different coefficients of expansion of glass at different temperatures, and the chemical changes resulting from higher temperatures, have also been known and taken into account in the same way. Each of these factors enters into the question of the accuracy of any glass tube used for the purpose of a thermometer. The divisions of the scale (as well as the starting point for any range of measurements wanted) will vary according to the size of the tube and the distance through which the column of mercury is driven by an expansion under a certain number of degrees of heat (this distance perhaps varying greatly between tubes intended to be of the same size, or even between different portions of the same tube). In the ordinary thermometer—that is, of the style perhaps accurately described as "house thermometers"—the temperature of the atmosphere is being measured, and the entire instrument is surrounded by the medium (the air) from which the heat is absorbed, and of which the temperature is to be taken. In the same way, a thermometer for measuring liquids, such as an ordinary bath thermometer, is substantially immersed, and the liquid envelopes substantially the entire instrument, as in the case of the thermometer hung in a room to measure the temperature of the air. But it is apparent that no thermometer appropriate in size and range of temperature and scaled to be used for household or living purposes would be suitable for any use in which the temperature of the air or of the liquid to be measured would be greatly increased.

Both scientific and commercial thermometers are needed and have been used for a long while in connection with the measuring of the temperatures of air, vapor, or liquids unbearable by human beings. Perhaps the plainest illustration, inasmuch as it appeals to various senses and presents the most difficulties with regard to our entire consideration, would be that of testing viscous material, like varnish, which must be boiled at temperatures much higher than the boiling

point of water. All thermometers depend upon the principles involved in a great lineal expansion of the small thread or column of mercury in the stem of the tube, in proportion to the diameter of that thread, as well as a converse proportion between the amount of mercury in the tube and the total amount in the bulb or holder of the thermometer. Thus, all thermometers can be immediately divided into the bulb or mercury holder and the stem or tube.

But a third division must at once be made; that is, the portion known as the head of the thermometer, or part of the tube to which a scale is applied. In the ordinary thermometers, all these proportions are so adjusted that the scale starts immediately at or very shortly after leaving the bulb. A scale covering ordinary temperatures from 0 Fahrenheit to 32 degrees Fahrenheit or 0 Centigrade, and on to 212 degrees Fahrenheit or 100 degrees Centigrade, would manifestly occupy a different portion of the thermometer tube than a scale registering from 200 to 650 degrees, which are typical of the so-called highgrade thermometers referred to in the Maurer patent.

What is meant, therefore, by the stem of a so-called high-grade thermometer, or of any thermometer to which the term could be properly applied, would cause no confusion in the trade, or to the public if informed at all upon the subject of thermometers. The movement of the mercury in the head of the thermometer—that is, the portion adapted and used for the taking of readings, wherever located, and at whatever distance from the bulb—will determine the markings of the scale, and this portion of the thermometer must be observed under an actual test, when the scale is being determined, if accuracy is attempted. It necessarily follows that the so-called "pointing" of each thermometer, in order to be accurate and of use as the basis for an exact scale, must be done under circumstances and conditions suitable to the particular thermometer being "pointed," and suitable to proper comparison with the conditions for which the scale is being prepared. The "pointing" of the thermometer, shown pictorially in the circulars produced as exhibits, needs but a word of explanation.

The uniform points, such as the temperature at the level of the sea under ordinary atmospheric conditions of melting ice, of boiling water, and of materials hotter by intervals of 100 degrees, will give so-called "points," between which a mechanical division of the spaces will be ordinarily accurate, or, if greater care is needed, intermediate points must be tested as well. But the particular phase of "pointing" with which we have to do in the present matter is dependent, not upon the method of marking off and dividing the space between the points obtained, but upon the conditions and the extent to which the source of heat is applied to the thermometer, with respect to its bulb, stem, and head.

As has been said, the quantity of mercury in the stem is small in proportion to the bulb, but this small quantity of mercury is capable of additional expansion, and when the lineal expansion is magnified, by diminishing the diameter of the column, the thermometer in whose stem the mercury is expanding will register higher than one in which the mercury in the bulb alone is affected. Similarly, the effect of heat upon the long glass stem itself would cause a different reading than

when the heat is confined to the bulb, and the application of intense heat or steam to the scale would injure the glass, destroy the scale, or interfere with the observation of the graduations, if the thermometer be entirely immersed in the medium whose temperature is being taken. In addition, to go back to the example of boiling varnish, such opaque or sticky material would prevent reading, if the thermometer were entirely submerged. But more important than these difficulties in operation, it would be impossible to properly "point" or mark such a thermometer, if in order to do so the entire thermometer had to be immersed in such material.

To proceed, then, to the use of such a thermometer, it is manifest, and the experiments produced in this case prove, that a long thermometer, of which the bulb alone should be inserted in boiling varnish, even if the temperature of the varnish be uniform, would give a different reading than if that thermometer were immersed to the upper portion of its stem; and the inaccuracy would be increased or diminished in proportion to the depth to which the thermometer should be inserted. Hence, to insure reasonable certainty in measuring the temperatures of such materials, or of ascertaining the temperatures at different depths in the material, it is necessary to use a thermometer, which at any depth of insertion will register merely the intensity of the heat applied to the particular portion which in that thermometer, when it was constructed and "pointed," was used as the source of heat application. This, of course, could be done in two ways. Either the heat measured in "pointing" the thermometer must be confined to the particular part which it is afterwards intended shall be free to the effect of the heat to be measured, or, both at the time of "pointing" and when in use, all parts of the thermometer, except that which it is intended shall receive the effect of the heat, must be shielded. It is manifest that the latter method would be more accurate than the former, inasmuch as all conditions would be the same, instead of merely having the important conditions the same. But, whatever be the method of "pointing," the advantages and objects are apparent.

The patent of Maurer in question claims to cover certain improvements to thermometers of this sort. It has been objected by the defendant that the various claims might have been each made the basis of an application for a patent. While such an objection might have been urged upon the Patent Office, it would seem that the patent should not be held invalid for this reason, inasmuch as the various improvements relate to one instrument, in such a sense that rather inaccurately, but still without confusion, they can be considered elements of one construction. And, particularly with reference to the claim with which we have to do, no confusion arises because the particular claim is associated with others in this patent.

The first three claims of the patent have to do with (1) the method of adjusting or curing any observed inaccuracy, either from long use of the thermometer or from unexpected conditions; with (2) the prevention of steam or other interference upon the reading scale; and with (3) a method of packing the bulb so as to quickly and uniformly, as well as safely, apply heat thereto.

The fourth claim, and the one with which we have to do, relates

entirely to the proposition which we have been discussing, namely, the securing of uniform expansion corresponding to the conditions under which the thermometer was "pointed," no matter what sort of material may be tested, and no matter what reasonable immersion of the bulb and stem of the thermometer may be had.  Claim 4 is as follows:

"4. A long stem thermometer having insulation applied to the stem of the mercury tube from the bulb to the thermometer head."

The defendants assert that the language of claim 4 of the patent is ambiguous, indefinite, and so broad as to render the patent itself in respect to this claim invalid.  These questions must be referred to in turn.  It is said that claim 4 would refer to any thermometer to the stem of which anything capable of being called insulation might be applied, whether the object of the insulation was for the purposes which we have already discussed or not.  It is further objected that the specifications of the patent show an attempt to attain the objects which we have been discussing, and that Maurer intended to attain these objects by means of glass tubes, packed to prevent breakage and contact, with a noncombustible or suitable material, such as asbestos, with a secondary result of securing further insulation through the noncombustible material or the air confined therein.  The defendants also contend that this claim nowhere refers to the subject of "pointing" in any way, and that the specifications, not being part of the claim, and even themselves not showing the method of "pointing," do not describe, nor does the patent and its claim suggest to the student or experimenter, a thermometer prepared for use, and then "pointed" or adjusted under similar conditions to what it may be intended to be subjected.  These various claims of the defendant are of significance mainly in connection with the condition of the prior art, the defense of anticipation, under which we must consider earlier patents, and the meaning of the term "insulation" as set forth in the patent.

But, before taking up other defenses, namely, whether the defendant can successfully prove long prior knowledge on the part of Maurer and others of the matters which the complainants allege were first disclosed by the patent, or whether the language of the claim is so broad as to include more than the invention (if any invention be proven), and whether there be infringement or not, it may be stated that the conclusion of any one from the patent as to how the "pointing" of the thermometer should be done would result purely in a difference in degree of accuracy, and presumably—in fact, almost certainly—the condition of the art will show, if it shows anything, that the insulation of any thermometer carried with it some insulation against inaccuracies in scaling or pointing, for otherwise the thermometers would have been of poor quality as to accuracy and commercially of little use.

In describing a patent relating to a limited field, it may usually be assumed that general language in the claims of a patent is merely general as to this limited field, and should not be held indefinite because as a matter of literary composition, the same language might have been applied to some other field, if the public would not be de-

ceived thereby. Hence it would follow that claim 4 of the patent would not seem to mislead, in so far as the making of a practical thermometer is concerned, by describing a thermometer "with insulation applied to the stem," to the extent that any confusion would result as to the need of "pointing," and when varying methods of "pointing" would only insure greater or less accuracy in the result. But, conversely, claim 4 can be construed only as describing a general idea of furnishing insulation from heat to the stem of the thermometer, or as describing the particular method of insulation shown in the specifications. With respect to these two matters we must examine both the prior art and the patents previously obtained.

The particular method described in the specifications of insulating by tubes, preferably of glass, packed with material, preferably asbestos, does not seem to have been what Maurer intended to claim when he used the general language above set forth. He must be held to the fair meaning of that language, and, if he had been attempting to describe a form of insulation such as he said he preferably used, some connection would have been shown between the language of the specifications and the statement of the claim. But he has contented himself with describing a form of insulation, and has then claimed insulation generally. As a matter of fact, the defendant is not shown to have continued any infringement of the glass tube method of insulating, after its attention was called to the matter, and there is not basis enough therein for an injunction. An adequate remedy at law exists and can still be invoked with respect to any such use. But if the general language of claim 4 is to be upheld, and every form of insulation of the stem of the thermometer considered the property of Maurer by reason thereof, then there would be no doubt that the defendant has been and is continuing to infringe the Maurer patent. We must therefore pass the subject of infringement and see if the claim of the patent be valid.

Certain thermometers have been introduced in evidence, both those claimed to have been purchased from the defendant and those made up for the purposes of experiment, and of these latter one is intended to represent the thermometer put upon the market by the complainant within a recent time. Experts were called by both sides, although a dispute arose as to the order of proof, and the defendant has asked that the complaint be dismissed on the ground that the complainant did not call his expert and furnish his testimony in chief until he was engaged in what was supposed to be rebuttal. The record would now indicate that the issue could have been more satisfactorily tried if the complainant had followed the usual course.

The defendant has also produced two glass thermometers, one of which is of a type that had been used for many years prior to the Maurer patent, and has been shown to have been sold upon the market for all of that time. This thermometer consists of a mercury holder, a long stem, and a head, with a glass tube surrounding the stem, and separated from that stem by rings or packing of some soft substance, such as asbestos, at intervals. The use of the outside glass tube is said to have been because the thermometer was prepared for testing the temperature of acids, and the substance whose temperature

is being measured would come in contact only with the bulb of the thermometer and with the outer glass tube. The column of air and the asbestos rings, therefore, would be the only places for heat communication between the outer and inner tubes, except as that heat was communicated from the bulb, and the defendant claims that the stem is in this manner insulated, while the complainant claims that the column of air in a glass tube is not insulation, in any sense.

Certain other thermometers have been shown, made by the complainant or his predecessor, and the defendant, for a number of years prior to the taking out of the patent, in the earliest one of which a brass shell or tube to prevent breakage was placed around the stem of the thermometer and the bulb, but no means existed to prevent the liquid, or whatever was being measured, from passing up inside of the tube and around the thermometer stem. Such thermometers were objectionable, both because of the inaccuracy caused thereby and because of the deposit of material within the metal tube. They were soon displaced by a form in which some sort of packing in a metal chamber closed the outside tube at the bottom, leaving the bulb of the thermometer, under various conditions, exposed to the liquid to be measured, while the stem of the thermometer was kept from coming in contact with that liquid by the tube for the remainder of its length. In this thermometer a column of air is (aside from the packing of the stuffing boxes) the only medium interfering with the transmission of heat from the brass tube to the glass stem, and in this respect the thermometer resembles the glass-tube acid thermometers above referred to.

The defendant has also produced a thermometer furnished by the predecessor of the complainant in 1891, and intended to extend from the inside of a hot room, through the wall, so that the scale would be in the adjoining room and yet the bulb would be exposed to the heat of the hot room. The stem was incased in a brass tube containing wooden spools, through the center of which the stem ran, to protect the glass and to take up the weight of the different parts. The heat of the hot or dry room apparently could pass into the brass tube for at least some part of its length. This thermometer greatly resembles some of those which must be considered in earlier patents and needs no further comment.

The defendant has also called attention to two constructions which the complainant admits have been claimed as infringements in other suits now pending, in one of which the stem of the thermometer is of no substantial length and the insulation would seem to be packing around the stem at the point where a coupling is to be made. The other construction, also admittedly the basis of a separate suit by the complainant, is that of a thermometer to show the temperature of cars for produce, in which a wooden tube and case for the thermometer head or scale projects through the side of the car in which the articles are being transported, and readings can be taken without opening the car. The important point of comparison between these two constructions and the thermometers in this suit and the peculiarity upon which argument is based by the defendant is that these thermometers are intended for use at a stable position or immersion, and the questions

of "pointing" and insulation, therefore, must be viewed from a different standpoint than those intended for variable immersion, such as the varnish thermometers and others.

A number of patents set up by the defendant and described in the evidence can be summarized briefly:

The Waler patent, No. 268,576, December 5, 1882, provided a chamber or flue passing through the case of a stove, by means of which a thermometer with the bulb in the oven could be protected from the fire of the stove, and have the indicator or scale at some distance above the stove on the outside. The claim states that this construction is intended to protect the thermometer tube from the heat of the fire, as distinguished from the heat of the oven. There is no variable immersion in this case, and the protection might be either as to increase of temperature or as to breakage from flame. But, whatever sort of protection was had, the idea of extending the stem of a thermometer so as to give a reading at a point away from the medium whose heat was to be measured was plainly shown, and covers one feature of the idea of claim 4 in the present patent.

The Bonte patent, No. 277,446, May 15, 1883, is much like the thermometer above referred to as having been installed by the complainant's predecessor in 1891 at the Lambertville Works, in that it describes a construction for measuring the temperature of steam within a boiler by a bulb having a stem projecting through the outside of the boiler, with the stem protected from contact with the side of the boiler, and with a column of air or an empty space surrounding that portion of the stem which is not intended to be acted upon by the steam.

The Guth patent, No. 294,732, March 4, 1884, and the Barrus patent, No. 392,980, November 20, 1888, do no more than throw light upon the idea of using asbestos as a packing, with possible insulating features, and the English patents of Heirons, No. 5,614, March 18, 1893, and Murrie patent, No. 10,805, September 12, 1885, again show the methods for registering heat at a distance from the bulb or place where the heat is supplied with asbestos or other packing to afford protection to a part of the stem.

The circulars of the complainant's predecessor, one of which was placed in evidence, shown to be issued and used in the year 1887, and containing testimonials of as early a date as November 1, 1886, advertises—

"exposed bulb thermometers, with adjustable scales to move upward as the mercury rises higher, by the contraction of the glass, etc. They have two stuffing boxes packed with asbestos packing, which holds the thermometer tube in place and prevents the oil or other substance from entering the inside of the brass tube. * * * Thermometers made in straight or angle shapes, with flanges, ground joints, or the standard pipe fittings," to register temperatures "from 40 degrees below centigrade to 700 degrees above zero, * * * with a steel chamber, completely inclosing the bulb and tube, preventing all contact with the hot oils, etc.; the bulb only being acted upon by the heat."

As shown by the cuts and descriptions, the elements of this thermometer, so far as the parts relating to the claim of the patent now under consideration are concerned, were the same as in the thermometers manufactured under the patent, except that the asbestos in

the earlier thermometers was used only for packing the stuffing boxes, being said to be nondestructible in any heat that the thermometer could register. In one place in the circular it is said that:

"The packing extends up through B until it reaches the graduated scale. This is done to prevent any contact between the metal and the glass."

It does not appear that the space within the metal tube contained anything other than air, except at the portions called the "stuffing boxes," and we must therefore take up the last question to be considered, and that is the precise meaning of the word "insulation," as used in claim 4 of the patent, and the effect upon that meaning of the various constructions and patents which we have described.

It is said that heat can be transmitted by three methods, conduction, convection, and radiation. The complainant defines "conduction" as absorption of heat by one body from another through physical contact. "Convection," according to the complainant's definition, is the absorption of heat by the flow or movement of particles where a gas or liquid is in contact with the heat source. "Radiation" is said by the complainant's expert to be the transmission of heat through space, without contact, and without any movement of particles. This definition does not define, and is explained only by a reference to the heat of the sun, which is transmitted certainly without physical contact, and, so far as the space is concerned, without a flow of gas or air particles, if that term can be used, so as to form convection. The complainant has entirely failed to explain or to recognize any connection between light and heat when discussing the subject of radiation, and has taken it for granted, as a premise, apparently, in his claim of infringement, that a thick, opaque varnish would radiate heat to an appreciable extent through air or through a vacuum, if convection were entirely prevented.

The complainant insists that insulation means protection from the transmission of heat, whether by radiation, convection, or conduction, and he attempts by a number of experiments to show that, in such a thermometer as that described in his later circulars, the column of air furnishes no insulation, inasmuch as he claims that radiation could still take place. He disclaims the use of asbestos as insulation in these earlier thermometers, on the ground that the asbestos was used merely in the form of washers or packing to prevent shock, and he disregards entirely the teachings of the early form of glass or so-called acid thermometers, because in the same way he claims that the column of air and the glass tube do not insulate.

The defendant, to answer this, presents a series of experiments with different thermometers, from which he draws the conclusion that questions of insulation as between these different thermometers are merely those of degree, and points to the older constructions, as well as the earlier patents, to show that the idea was the same, and that Maurer merely conceived a change of method, without invention. If this be so, then Maurer's patent would be of no value, except as it might have been worded so as to apply to the use of glass tubes with asbestos packing. But this is expressly disclaimed by the complainant, and the validity of his patent is made to depend by him upon the

filling of the metal protecting tube with some substance, such as asbestos, glass, or any other material, which he claims will effect his ideas of insulation·from these supposed radiating rays of heat.

It would seem that insulation could be as properly applied to interference, such as that offered by glass to rays other than those in the form of light, or such as asbestos· (which is shown to be a good conductor of heat, unless so loosely constructed as to imprison air within) when applied to radiation, or of any·solid substance when applied to convection. It is shown by the defendant that a certain style of thermometer to take the temperature of soil in hot beds had been known for a number of years, certainly long before the patent in question. In so far as these thermometers had a long stem, which protected the stem from the same contact as was afforded by the metal cap inclosing the bulb, and would apparently give approximately similar readings upon variable immersions, they embodied the same ideas as those attempted to be obtained by Maurer at a later date.

The essential·element of the Maurer patent in claim 4 was a use of the old ideas embodied in both the long stem thermometers with a glass or metal protecting case and in such patents as those for taking the temperature of steam within a boiler or the heat in the oven of a stove. With these forms of construction he made his metal case so as to protect the reading or recording of the temperature against changeable and variable immersions, and laid his claim for a patent upon using a different substance for insulation. These ideas were all old, and Maurer's only discovery seems to have been that "insulation," as he called it, should be confined, in his opinion, to a substance like asbestos or glass packed in a tube. This opinion seems to have been unwarranted. It must be held, therefore, that claim 4 of the Maurer patent is invalid, unless it be confined to the glass tube in an asbestos packing· construction. Its language does not warrant this limitation, nor is this claimed by the complainant, and hence can be disregarded so far as this action is concerned.

Under this view of the case, the question of whether the individual defendant was responsible for the infringement is immaterial. But in so far as he has been shown by the testimony to have actually directed the various forms of manufacture, there seems to have been reason for including him in the action, and the complaint will be dismissed as to both upon the merits, with costs.