LINDE AIR PRODUCTS CO. v. MORSE DRY DOCK & REPAIR CO.

(District Court, E. D. New York.   January 22, 1917.   On Settlement of
Decree, March 1, 1917.)

1. PATENTS ☞328—VALIDITY—METHOD OF CUTTING METAL.
The Jottrand patent, No. 831,078, for a method of cutting plates, pipes, and other metal articles, consisting specifically in directing a heating jet upon the object to be cut along the line of section, so as to raise the metal to a temperature enabling oxidation without fusion of the metal, in directing simultaneously a jet of oxygen under pressure upon the heated part of the object, and in moving simultaneously both jets along the line of section, is void for anticipation and lack of invention over the prior art, and especially the disclosures of the prior Menne American and German patents; the Jottrand process being merely the application of the Menne process to a particular purpose requiring only mechanical skill.

2. PATENTS ☞19—"NEW INVENTION"—PROCESS.
A process is patentable, even if it uses old machinery, if the mode of treatment is new and useful; but the mere diminution in size or reduction in quantity, which may prove advantageous in an application of a certain device to accomplish one specific object or result out of all those covered by a broad prior patent, does not of itself constitute a "new invention."
[Ed. Note.—For other cases, see Patents, Cent. Dig. § 19.]

3. PATENTS ☞39—INVENTION—PROCESS.
A new and patentable method cannot be predicated upon directions to use a device in some particular way, which requires nothing but skill in the operator or attention to the relative size of the appliances, if the result and method of accomplishing the result were disclosed in the earlier patent.
[Ed. Note.—For other cases, see Patents, Cent. Dig. § 46.]

4. PATENTS ☞198—ASSIGNMENT—MODE OF EXECUTION.
Where an assignment of an American patent was executed by the heirs of the patentee in Belgium before a United States consul, which made it sufficient to pass title in the United States and to be entitled to record, it is immaterial that it was not so verified as to prove itself in the Belgian courts.
[Ed. Note.—For other cases, see Patents, Cent. Dig. § 277.]

5. PATENTS ☞323—SUIT FOR INFRINGEMENT—DECREE.
In a decree for defendant, in an infringement suit, on the ground of invalidity of the patent, the court will not include findings on issues determined in favor of complainant, which would not be reviewable by the appellate court.
[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 596–599.]

In Equity.   Suit by the Linde Air Products Company against the Morse Dry Dock & Repair Company.   On final hearing.   Decree for defendant.

Kerr, Page, Cooper & Hayward, of New York City (Thomas B. Kerr and Drury W. Cooper, both of New York City, of counsel), for plaintiff.

Gifford & Bull, of New York City (Livingston Gifford and C. G. Heylmun, both of New York City, and J. B. Hull, of Cleveland, Ohio, of counsel), for defendant.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

CHATFIELD, District Judge. This is an action for infringement of United States method patent No. 831,078, issued September 18, 1906 (upon application filed August 22, 1905), to one Felix Jottrand, a Belgian, who in applying for the patent in question stated that he then resided near Brussels. The Jottrand United States patent is stated by the inventor to cover—

"a method of cutting plates, pipes, and other metal articles; * * * and it has for its object to enable such articles, particularly those of iron or other readily oxidizable metal, to be cut almost instantaneously."

The method consists—

"in heating the object to be cut along the line of section by means of a blow-pipe, * * * and to simultaneously direct upon the said line at a certain distance from the jet of the heating blowpipe a jet of oxygen under pressure to effect the cutting of the object by chemical action upon the heated part, the metal being raised to such a temperature as to enable oxidation to take place rapidly without fusion of the metal, while the oxides, which are more fusible than the metal itself, flow readily, and the severance is perfectly clean, as though the metal had been sawed."

The specifications describe in general an apparatus supplying the two jets above referred to: One, the jet of the preheating flame; the other, the jet for the oxygen. The "certain distance" referred to is provided for by arranging and regulating, relatively to the heating nozzle, the conduit for the oxygen, so as to "direct a jet of oxygen to the point which has been raised to the proper temperature by the heating flame."

The testimony, at considerable length, analyzes and describes these various steps, in order to make clear the propositions which are presented, as soon as study of the art has prepared a foundation for consideration of the language used. It appears that materials such as steel and certain grades of iron (wrought iron, etc.) oxidize at a temperature appreciably less than the melting point of the material. For instance, the melting point of steel is between 1,300 and 1,400 degrees C., while the melting point of iron is from 1,520 to 1,587 degrees C. If either steel or malleable iron be heated cherry red—that is, to a point approximating 1,000 degrees C.—it will unite or combine rapidly with oxygen. The magnetic oxide or slag produced by this chemical action has a melting point between 1,250 and 1,260 degrees C.

The evident purpose of Jottrand, as described, was to accomplish the precise results which may be observed in practice. Experiments at the trial, the commercial operations of parties licensed under the Jottrand patent, those acts of the defendant which are claimed to infringe the Jottrand patent, and the other uses which are set forth in the testimony, all show the same chemical processes caused by a similar physical arrangement of parts and conditions.

In all so-called commercial cutting, with any form of torch, such as those brought into this case as exhibits, a supply of gas suitable for use in a blowpipe is ignited at the nozzle of the blowpipe in order to give the preheating flame. In practice, the various parties seem to be in agreement, that the most convenient and best form of nozzle consists of a number of apertures forming an outer ring for combusti-

ble gas. In the center of this ring is a contracted aperture connected with the supply of oxygen under pressure (controlled by a valve or cock) independent of the supply pipes leading to the mixture chamber for the combustible gas of the outer ring. From this central opening can be projected a "jet" or pencil of oxygen, which will penetrate the heating flame and come in contact with the heated metal in a narrow path, as the nozzle is moved in the direction of the desired cut. This will increase combustion, and yet will not drown or smother the heating flame by a large excess of oxygen, which is not of itself a combustible gas.

In the Jottrand patent the oxygen nozzle is shown as a separate tube outside of the blowpipe nozzle, which may or may not present a single aperture. In the case at bar the plaintiff alleges that the nozzle, showing the oxygen jet in the center of a ring formed by the apertures of the blowpipe nozzle, is but an equivalent for the structure shown and described in the specifications and drawings of the method patent in suit.

The defendant, in alleging the defense of invalidity or lack of invention, admits this doctrine of equivalency, but at the same time insists upon the plea of noninfringement, if the Jottrand device patent be brought into the case for the purpose of drawing proof from that form of torch which literally complies with the specifications and drawings. As both the plaintiff and the defendant in practice use the equivalent form of nozzle, which is like the blowpipes of the prior art, the device patent was withdrawn from the suit.

The defendant bases its claim of lack of invention, nonpatentability, and anticipation, aside from alleged public use by one Harris, which will be discussed later, upon the same evidence as that offered to show the state of the prior art. The record shows that in the early part of the nineteenth century an oxyhydrogen or compound blowpipe, with two concentric nozzles, was invented by Dr. Robert Hare, of Philadelphia. In this form of blowpipe the oxygen nozzle was inside the ring of the hydrogen nozzle, and the blowpipe was used to fuse substances which had previously been considered infusible, including platinum. In 1832 a burner was invented by Professor Daniell, of King's College, London, which was described in the various editions of Silliman's Chemistry, and which as late as 1888 was the subject of a paper read by one Thomas Fletcher before the Society of Chemical Industry, at Liverpool, in which such experiments were described, as fusing the end of a $3/16$-inch wrought iron rod, or the fusing of a hole through a chilled iron plate, such as those used in burglar proof safes.

The general form of the Daniell blowpipe or burner has two tapering concentric internal bores, with a stopcock connecting the internal or smaller tube with oxygen gas, while the outer or larger tube supplies hydrogen or other combustible gas, with the intention of uniting these gases in combustion at the end of the tube, in order to produce the hot flame required. The inner tube was used for the transmission of the oxygen gas under pressure, thus forming a blowpipe, in which the jet or pencil from the inner tube would force itself into the flame at

the nozzle. The chemical effect of oxygen upon heated iron was of course well known during the nineteenth century, as were also the melting temperatures of iron and iron oxide, as stated above.

In the Fletcher process of fusing holes in an iron plate by means of a Daniell blowpipe, certain chemical reactions, with physical changes, took place, as to which all the witnesses in the present case seem to be in accord. The heating effect of the blowpipe raised the temperature of the iron to a point where the supply of oxygen served the double purpose of feeding the blowpipe flame and of oxidizing the heated metal against which the blowpipe was directed. As soon as this oxidation took place, a great increase in heat was produced, which, in turn, immediately raised the temperature of the surrounding particles above the melting point of the iron, and to a greater degree above the melting point of the iron oxide itself. The evident problem presented would be determined by the size and proportions of the object upon which the flame was directed. If the melting process extended through the plate, a hole would be perforated. If the melting occurred at the edge or end of the piece of metal, the molten part would drop off.

Upon May 25, 1901, a German patent was taken out by one Herman A. E. Menne, No. 137,588, followed by United States patent No. 703,940, of December 12, 1901, and German patents Nos. 140,149, 143,-640, and 147,541, all during the year 1902, and elucidated in an address published in the "Zeitschrift" of July-September, 1904. These patents were all process patents, while United States patent No. 705,418 and German patent No. 140,148 were obtained for a device to be used in carrying out the processes named. Dr. Menne developed his method from the necessities of opening tap holes to blast furnaces, or removing the metallic masses which form at times through cooling in and around the openings of blast furnaces, and which, if not removed, may cause the loss of the entire contents and occasion delay in cutting out the refractory material after cooling. But from the practice in connection with blast furnaces, Dr. Menne, in the address in question, says:

"Another very extensively used application of the method has been found in the rapid dismounting, piercing, separation, slotting of iron and steel pieces of any kind, as, for instance, anchor bolts, armor plates, clutch pieces, pump rods, etc., in that the sawing through or rasping through, etc., operation usually requiring hours and days, is shortened to a few minutes, and that the work may be carried on in loco."

He also says:

"A piece was melted through its entire length in a few minutes. * * * The said process is of great value, whenever it is necessary to effect rapid dismounting (taking down scaffoldings, dismantling). * * * Thick iron supports, columns, rails, etc., can be severed in a few minutes."

Dr. Menne specifically says, in these patents and in the address, that this process of severance by melting is to take the place of sawing or rasping; that is, of making a severacne so as to separate in parts. Menne did not specifically claim invention of the type of torch or instrument which he had in mind for this purpose, but says in his

address that it is constructed similarly to the Daniell burner, and states that the oxygen jet is much smaller than the heating gas opening. In his American patents, supra, he describes and shows a drawing of the torch or nozzle in which the outer or hydrogen tube is about five times the size of the oxygen tube, and in which the oxygen tube itself is described as an inner narrow (but not converging) tube of about 4 mm. bore. In the form of torch used by the plaintiff and the defendant, under present conditions, the oxygen tube has a nozzle opening of about 1 mm. and the opening for the hydrogen flame is approximately 6½ mm. In the drawing of United States patent No. 703,940, Menne illustrates the bore of his outer tube by a drawing allowing 15 mm. as the diameter of this tube, while the inner oxygen tube is represented as having a uniform diameter of about 2 mm.

Menne specifies a use of the tube in much the same terms as have just been employed in describing the operations of Fletcher. He ignites the combined gas at the nozzle. He then heats the surface of the metal with the flame produced. He then turns on a further supply of oxygen, under a pressure of as much as 20 atmospheres, and with this he not only oxidizes the heated metal, but thereby produces so much local heat as to melt the surrounding metal and blow away or forcibly remove the molten material before its heat can be conducted off, with resultant solidification. He thereby supplies as well a fresh metallic surface for the further application of heat, in order to renew the material for continuing the process of oxidation, and thus makes progressive and continuous the melting of the surrounding material, until the metal is punctured and the parts against which the torch is being operated are entirely melted and removed.

The mere mechanical need of care in avoiding a splash of molten material or flare-back in the burner has nothing to do with the development of the process, and Menne recognized that the effect of an excess of oxygen was to cool the flame. Under circumstances where oxygen was present in excess, or where noncombustible material presented solid instead of molten particles, an increased pressure in the oxygen jet must be met by an increase in the gas feed, by which means the heat of the flame would be increased and the resulting increase of pressure would also aid in removing the solid substances. In an addition filed as the German patent No. 140,149, Menne states that, if the part to be melted is hot enough to be affected by the oxygen without the additional heating from the torch, then it can be melted away by continued play of the oxygen under suitable pressure, and that the original heat could be supplied by some other means than the blowpipe.

In German patent No. 143,640 he states that the melting is started by introducing oxygen in excess into the flame, and may be continued with oxygen alone. He also develops this idea further in German patent No. 147,541, in which he says that the combustion gas may be shut off if the mass is sufficiently preheated and contains sufficiently combustible substances. Menne evidently appreciated the proposition that control or limitation in the application of the oxygen to the heated surface would define or restrict the amount of material which would

239 F.—58

be oxidized—that is, which would unite in combustion; and he also appreciated that this combustion would impart heat to the surrounding metal and could be limited so as to produce only a uniform and more or less regular extent of melting. He says that iron and steel pieces may be dismounted, separated, slotted, and melted through in place of cutting with a saw or file. He refers to the removal of a ring or collar by a severing through the melting process.

If the operator applied only that amount of heat which would render subject to the oxidizing effect those particles included within what would be a hacksaw cut, if he could supply oxygen so as to chemically act upon those particles and no others, and if the position of these particles is such that they can immediately drop away with such assistance as the oxygen supply may afford, if the advance in the heated area can be accurately limited to the particles immediately in front of the moving stream of oxygen (or if that heating is kept up by the blowpipe flame, advancing with the stream of oxygen, if the effect of blowpipe flame and the supply of the oxygen is reduced, so as to give just the amount necessary to produce these results), we should have, when accurate movement is insured, a sharp cut even in line upon each side and as narrow in width as conditions could allow. This ideal cut was the thought in Jottrand's mind, and he filed his application with a view to patenting the method of producing such a cut, and also the instrument or torch by which the blowpipe flame and the stream of oxygen could be supplied as he suggested.

[1] The testimony thus presents an issue which is difficult of determination, but which may be easily stated and understood from the standpoint of the prior art, and also from the application of their deductions by the expert witnesses in expressing an opinion. The prior art, as particularly illustrated by the Menne patents and the Menne address, had in mind and sought to describe a method and device for the production of a heat which would melt through the resisting substance at any point where penetration was desired. If the lateral spread of the melting (that is, the width of the path of penetration) was to be limited, and if the material was to be slotted or bored or pierced, then the line of this slot could be directed by the interposition of a shield which in the form of a stencil would protect that part of the material which is not to be subjected to the melting influence. In this sense, the prior art shows full appreciation of the self-evident proposition, that, if material is melted in two, a severance will be the result. Dr. Menne evidently appreciated the application of his melting process, that is, the chemical reaction of oxygen upon preheated iron, so as to contribute a melting heat to the surrounding surface for the purpose of making the melted surface subject to removal, and he coupled the application of this chemical process with a forcible removal by the application of the stream of oxygen under pressure.

It would thus be old in the art to merely blow out, or allow to flow out, the melted product of oxidation. It was old in the art to oxidize and to produce adjacent melting. If the object desired was merely to accomplish a melting to such extent as removal of the melted fluid might be desired, then the disclosure of Menne was complete.

But in this sense the Menne process was an equivalent for the use of a hacksaw, in that the removal of a part of the material by a hacksaw would secure its absence to the same extent which removal by melting would insure an open space instead of the solid iron.  If hacksaws had never been invented, it would be difficult to conclude that the use of one, or the method of removing iron by means of a saw, should be held anticipated by the Menne processes.  If the cutting of wood had always been done by repeated blows of an ax, the severance of the article would not render invalid the invention of a saw to deliver a great number of small cuts in a narrow line.  This would furnish the basis for a device patent to make the cut.  But could a person claim that he had a patentable method of using the device, or of the way he delivered these restricted cuts to such material as would chip off, instead of bending easily?  Or could he thus obtain a patent for a method of cutting by a special saw such kinds of metal as would act like wood, if ordinary saws had already been used in wood cutting?

This brings us to the question just discussed by the Supreme Court in the case of Minerals Separation, Limited, et al. v. Hyde, 242 U. S. 261, 37 Sup. Ct. 82, 61 L. Ed. ——, decided December 11, 1916. The court there upheld a method patent for an advance in process which, "because of its economy and simplicity, has largely replaced all earlier processes.  *  *  *  Diamond Rubber Co. v. Consolidated Tire Co., 220 U. S. 428 [31 Sup. Ct. 444, 55 L. Ed. 527]; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 429, 430 [22 Sup. Ct. 698, 46 L. Ed. 968]; The Barbed Wire Patent, 143 U. S. 275 [12 Sup. Ct. 443, 36 L. Ed. 154]; Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486 [23 L. Ed. 952]."  The court says the patentees "discovered the final step which converted experiment into solution, 'turned failure into success' (The Barbed Wire Patent, 143 U. S. 275 [12 Sup. Ct. 443, 36 L. Ed. 154])."

[2] As was said in Cochrane v. Deener, 94 U. S. at page 788, 24 L. Ed. 139, a process is patentable, even if it uses old machinery, if "the mode of treatment" is "new and useful."  "A process requires that certain things should be done with certain substances and in a certain order."  But Jottrand uses in general an old form of device, he uses a known form of gas in the same mixture as shown by Menne and others, he performs the same steps in the same order, but applies these with the idea of "cutting," instead of "melting."  Menne developed the idea of melting and described the collateral steps which would constitute cutting.  Menne did not have in mind the use of this method of cutting in its full commercial development of economy in metal and in oxygen.  But the increased use of oxygen and its cheaper production, which led to its commercial application at about that time, did not produce new "steps."  It only required the use of the old steps, with careful observance of the application, so as to adjust the use to the need and to economic results.  Jottrand described a device which may have been patentable in its exact form, but which is not broad enough to bring in the defendant as an infringer of the device patent, and his method patent did not depend upon its use.

As was said in Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, at page 556, 18 Sup. Ct. 707, 42 L. Ed. 1136, a patent cannot be granted for a "principle," or a "mode of operation," and one who has made an improvement cannot include all claims to the whole art or discovery which he has improved.   See cases therein cited. From his standpoint, Jottrand sought not the mere accomplishment of melting and the removal of the iron, with the highest degree of perfection attained by the greatest amount of melting, if refractory substances were encountered.   Jottrand, on the other hand, had in mind a method of avoiding melting.   He goes so far as to claim a method of producing no melting of the metallic iron.   He sought to describe a method of severance of certain kinds of iron by means of a narrow cut like that of a saw, which would be the exact equivalent of a cut produced by a hacksaw.   He claims the right to patent, not the method of making two pieces of iron by a cut, but the method of making a saw cut, with an apparatus which tends to produce melting.   He limits his method to an amount of melting productive of a temperature effective only upon that material made fluid below the melting point of the iron, and he keeps ·the acting temperature down below this melting point of the iron by controlling the application of the heat from oxidation, and by removing the material at just such a rate as will thus control that production of heat.

Granting that the chemical processes of oxidation and the physical transmission of heat, as well as the physical removal of the melted material, is the same in the Menne process and in Jottrand, the question presented is not whether Menne was working in the direction of applying a melting flame to useful purposes, and whether Jottrand was attempting to accomplish the same useful purposes by a different method of applying one kind of melting flame (the answer to these questions is apparent), but the problem presented is whether Jottrand thus shows a patentable method, and whether, if his method be patentable, it is distinguishable from the evident variations of the Menne process. The mere diminution in size or reduction in quantity which may prove advantageous in an application of a certain device to accomplish one specific object or result out of all those covered by a broad prior patent does not of itself constitute a new invention.   De Lamar v. De Lamar Min. Co., 117 Fed. 240, 54 C. C. A. 272; Guidet v. Brooklyn, 105 U. S. 550, 26 L. Ed. 1106; Bullock Electric Mfg. Co. v. General Electric Co., 149 Fed. 409, 79 C. C. A. 229.

This is no different from the mere adjustment of parts in an instrument, where the use of that adjustment makes certain some particular desired result, and where that particular result was known as obtainable by the particular adjustment, either to the prior inventor or to any mechanic using the device.   Estey v. Burdett, 109 U. S. 633, 3 Sup. Ct. 531, 27 L. Ed. 1058; Pomace Holder Co. v. Ferguson, 119 U. S. 335, 7 Sup. Ct. 382, 30 L. Ed. 406; United States Repair & Guarantee Co. v. Assyrian Asphalt Co., 183 U. S. 591, 22 Sup. Ct. 87, 46 L. Ed. 342.

[3] Nor can a new method be predicated upon directions to use a device in some particular way, which requires nothing but skill in

the operator or attention to the relative size of the appliances, if the result and the method of accomplishing the result were disclosed in the earlier patent. Siemund v. Enderlin, 206 Fed. 283, affirmed 212 Fed. 410, 129 C. C. A. 604; Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935. Mere reduction in the size of the oxygen tube, or even the tapering of the tube, as shown in certain forms of the Daniell burner, would not furnish invention over the Menne patents, if Jottrand delivered his supply of oxygen under such pressure and in such a way as to induce heat, with resultant melting to as great an extent as the heat could accomplish. These mechanical changes were old, and their effect known. Howard v. Detroit Stove Works, 150 U. S. 164, 14 Sup. Ct. 68, 37 L. Ed. 1039. Dr. Menne expected radiation, and sought to overcome solidification of the melted material, which he wished to remove, by melting sufficient (through the heat produced by oxidation) to present a molten mass only in the area upon which the oxygen under pressure would be driven. Jottrand in practice prevents radiation, with the resultant cooling of the molten material, by removing the melted oxide; but he thus limits the further radiation of heat and resultant melting to the physical boundaries of the saw cut or kerf which is the intended result of the method.

We must therefore look to the statement of the Menne process itself, and to the language of the Jottrand patent and claims, in order to see if Jottrand is but a clever elucidation of something which was actually in Menne's mind, and which was plainly set forth in his description of illustrative operations. We must consider the effect of using the same chemical reaction, but with a different pressure in the oxygen delivered by the extra jet and the employment of a definitely shaped nozzle.

Menne had no reason to consider the difference in the melting point of the oxide and of the metal, except in so far as it entered into the production of sufficient heat to cause melting generally. Menne did not need to consider, and did not consider, the difference between steel and cast iron, in its capacity for oxidation, nor in the amount of heat which was required to produce melting. Menne planned to heat to a sufficient temperature to oxidize the substance upon which he was working. Menne planned to melt or reduce the substance encountered after oxidation. If it proved to be metallic iron or a refractory substance, he produced heat to melt it, so it could be removed by the oxygen jet and gravity. Jottrand, on the other hand, describes only a practical application, which in its theoretical perfection is limited to steel or iron, subject to oxidation at a temperature lower than its melting point.

The trend of the argument can be observed from the statement, made by Menne, that the operator needs only some heating apparatus and a flask of oxygen with a means for supplying it to the heated surface under pressure. Menne contemplated the possibility of first heating the iron and then bringing the oxygen jet by an independent pipe or hose to a point where it could play upon the heated surface. He plainly contemplated that this pipe or hose supplying the oxygen could be used as water would be used to wash off ice. Jottrand, however,

prescribes that the oxygen jet shall be placed at a "certain" (that is a fixed) distance from the hydrogen jets or nozzle, and he suggests that this "certain distance" means one which is appreciable, as well as fixed. He says that the second nozzle is to be capable of regulation "appropriately in relation to its heating nozzle." He then says that the object will be cut "without appreciable loss of metal along a perfectly regular line; it being only necessary to cause the blowpipe nozzle to follow the contour to be cut."

While evidently the nozzle openings may be arranged in different ways, it is Jottrand's purpose to preserve their fixed relative position while the cut is being carried on. He thus arrived at the idea of his device patent, but did not necessarily employ any new process or method. It is evident that, if Menne were using the methods described by him for the purpose of cutting or severing a plate or strap of metal, he would have applied the heating flame until the metal appeared to be ready for the application of oxygen. He would then have applied the oxygen, and if the force of the oxygen was greater than that neccessary to remove the molten oxide, and if this surplus of oxygen cooled his heating flame, it is evident that he would have reduced the quantity of oxygen. It would seem not to require invention to reduce the pressure, and thus prevent waste as well as excessive oxygen, if the supply were evidently too plentiful.

Menne shows in his address, as well as in the United States patent, full appreciation of the effect of too much oxygen and the necessity of increasing the heating flame to overcome the excess, if the excess be necessary to melt and physically remove the molten material. It is difficult to see how a mere change in the degree of pressure or in the quantity of material allowed to be used can involve invention or be the basis of a different method of operation. The difference in expert manipulation of the tools would involve the same propositions as a difference in mere adjustment or application of the gases applied by the operator.

There is evidently no patentable feature in the change from a blowpipe fitted with a Daniell tube for the supply of oxygen (which not only was old in the art, but was plainly disclosed by Menne) to the so-called torch or blowpipe of the Jottrand licensees and the defendant, which provide in a natural manner a convenient structure for furnishing, as in the well-known Daniell burner, a supply of oxygen in the form of a jet. If Menne used a pipe relatively one-fifth or one-sixth the size of his blowpipe aperture, in order to deliver oxygen which was under sufficiently heavy pressure to supply it in quantities at the orifice, no patentable novelty over the Daniell burner would be shown, in reducing the size of the oxygen pipe and tapering the orifice, if the desired object was to confine the discharge in direction and in quantity with the resultant increase in velocity. This is, of course, the well-known method of constructing any nozzle or jet orifice, and would be the one naturally used if the purpose were understood and desired. Hence it would require no invention for Menne to make his Daniell burner in the form of the device used by both the plaintiff and

the defendant, if Menne had in mind the method or the object which would thus be attained.

We are therefore brought back to a consideration of the patentability of Jottrand's application of the chemical and physical propositions involved in the cutting of a thin sheet or plate of iron by one who made the obvious changes in the Menne device needed to carry out the operation exactly set forth in the Jottrand patent. Dr. Menne shows appreciation of the chemical reactions following the application of oxygen to the preheated metal. He also understood the chemical reaction and the physical phenomena resulting from an increase of heat, produced by increased oxidation. He specified in his various patents the reduction of refractory substances by this means, and the production of *sufficient heat to melt the metal to be removed* by the physical force of the oxygen jet. But in using these reactions he does not refer to the limitation in use of the method, so as to produce only similar chemical reaction under those physical conditions existent, when the product to be melted reaches the melted condition and is removed before a temperature is produced and maintained in position which will melt the adjacent metallic iron. Everything relating to the result, from both a chemical and physical standpoint, was well known in the art.

Assuming, therefore, that Menne did not specifically figure out or state that physical condition and arrangement of parts which would continue the conditions under which iron oxide could be melted, but metallic iron would be left solid; and assuming that Dr. Menne passed over any reference to these points as collateral, and hence not necessary to be elaborated in describing the production of heat for the purpose of melting as rapidly as possible, or to as great an extent as possible, we are compelled to consider whether Jottrand, by contemplating and arranging to produce the restricted melting which was sufficient for his needs in melting iron oxide, and in cutting a narrow path, discovered anything more than would be observed by any chemist who was attempting to describe the operations of a mechanic following the Menne method, with the intention and purpose of severing the iron with as little melting as possible. It would not be invention to merely restrict the amount of melting so as to save material. Mere economy in the use of the agents, or in the effect of the result, describes neither a patentable device nor a patentable method.

The plaintiff in this case seeks to patent the application of this idea by stating that the particular use results in economy and hence commercial advantage. He seeks to differentiate by showing that Menne overlooked the economy and had in mind producing a result which involved waste of the material used. But if, following Menne, with the idea of practicing economy, a mechanic would use the parts and produce the result exactly as Jottrand describes, then it is arguing in a circle to find that Jottrand differs from Menne, and has made an invention, because he correctly described and understood those steps of the Menne process which any mechanic would use in doing that which Menne understood, but did not consider from its economical, commercial application to the severing of metal in particular instances

which were only clean and definite forms of rending the solid metal apart.

In considering the understanding which Menne had or did not have as to the amount of melting produced, where the size of the supply of oxygen, and the duration of its use in one place, did not raise the temperature to the melting point of the iron, we find upon examination of the Menne United States method patent that he says:

"When the combustible slags or masses are sufficiently hot, so as to burn in the oxygen current, the hydrogen gas can be entirely cut off, and the melting can be continued with oxygen gas only. This is a way for obtaining narrower holes, as the oxygen gas, escaping from its narrow nozzle, attacks a smaller area than the larger combined flame."

Here we get evidence that Menne contemplated turning off the preheating flame entirely, so as to melt only that portion which would be raised to a melting point by the oxygen nozzle. This is direct evidence that Menne was describing a limitation to both the extent of the melting and the temperature which might be required to reduce the slag to a molten condition. If the slag is refractory to heat, Menne says the supply of oxygen must be increased correspondingly with the supply of combustible gas, so as to produce greater initial heating and greater resultant heat from oxidation. If, on the other hand, the slag melts at a low temperature, then the preheating flame ceases to be of importance, and the heating of oxidation from the oxygen escaping through the narrow nozzle, but still directed with sufficient force to remove the melted material, will make it possible to progress so as to obtain "narrower holes." A narrow hole, if boring or piercing is the object, is self-evident.

But suppose we apply this idea as stated by Menne to his process of slotting or severing as a substitute for rasping through. We should then, looking at the matter from the standpoint of the expert, describe the actions of the mechanic as follows: By the Menne device, a preheating flame is directed to the metal. When the combustible slag or mass affected by the preheating flame is sufficiently hot to burn in the oxygen current (that is, in the case of steel or wrought iron, when it gets cherry red at about the temperature of 1,000 degrees C.), the mechanic will (as the application of the pressure from the oxygen nozzle starts kindling of the iron with resultant melting at the point of contact) cut off the preheating flame and limit the application of oxygen from the nozzle to the narrow hole which is to be extended into a narrow space of severance (or a narrow slot). The mechanic will find that, if the amount of pressure and the supply of oxygen be maintained at a proper amount, so as to remove the molten metal and furnish a melting heat in advance of the flame, it will be necessary only to regulate the speed with which he makes the slot, in order to bring the metal in advance of the oxygen nozzle to the kindling point, and thus have material upon which the stream of oxygen may advance, while evidently the molten material will in the meantime have been carried away at the *melting temperature* of the *"combustible slags or masses"* which have been melted in the narrow hole.

The result would be the formation of a kerf or slot like that de-

scribed by Jottrand and showing upon the sides such portions of molten metal only as had been reduced to that condition by the heat produced during the removal of the combustible mass against which the stream of oxygen had been directed. As has been observed, a mechanical feed and torch holder, as well as expert manipulation, allows a closer approach to the theoretical or perfect cut; but the principle of cutting is no different. Jottrand describes a way of saving metal or material, by intelligent observance in application of the methods which Menne suggests should be used for the purpose of making a restricted severance of the material. This is not the description of an invention on which could be based a method patent.

But much more would it seem that Jottrand was describing a use of the Menne devices and methods, when we refer back to the Daniell burner, which Menne himself says he used, and to the Hare blowpipe as described by Silliman and Fletcher, with which the results of oxy-acetylene cutting can be exactly produced, when a mixture of oxy-acetylene gas is substituted for the hydrogen gas of the original Hare blowpipe, or for the outer tube of the Daniell burner. Menne is working away from the teachings of Hare, Silliman, Daniell, and Fletcher when he opens the converging interior nozzle of the Daniell burner into a tube with an even diameter, which will allow a larger escape of oxygen and a larger amount of melting. But when he also refers to the use of the narrow oxygen nozzle of a Daniell burner, to melt a narrow hole, without further use of a preheating flame, he discloses all that is necessary to enable the mechanic to employ (when he does not wish a large area of melting) either the uniform narrow tube such as is used, according to the testimony, by various persons in the United States for the purpose of cutting, or the Daniell burner converging nozzle, such as that actually used by the defendant in the operations complained of in this action.

This makes it unnecessary to consider in detail the operations at the Chenango furnace, in which a large gas pipe, with a smaller inclosed gas pipe for the supply of oxygen, was used to melt in a pool and to blow out the resultant hole in an iron casting which was located a distance of some feet from the operator of the torch. It is therefore unnecessary to consider the difficulties suggested in the plaintiff's case by the description of the defendant's operations, which produce the results described by Dr. Menne in his reference to the employment of his device and method for the removal of anchor bolts, the slotting and separating of armor plate, etc. The defendant uses the process for cutting off the heads of bolts in the plates of iron ships. One bolt might be cut with inordinate melting, as described by Menne, and the next with a narrow kerf, as stated by Jottrand. But Menne says that the "method is applicable everywhere that masses are present which can be oxidized," and "the suggestion for the development of the method" for slotting or severing "originates from blast furnace practice."

Can the "development" be limited to that use only which caused its origin or discovery? Obviously not, and careful observation of "development" or application is no more than the description of a func-

tion of a machine when used for some particular or novel purpose. Such description is not invention. Risdon Locomotive Works v. Medart, 158 U. S. 68, 15 Sup. Ct. 745, 39 L. Ed. 899. The operations of the defendant are claimed by the plaintiff's witnesses to be Jottrand. They are claimed by the defendant's witnesses to be Menne. The chemical processes evidently are not in dispute. The torch used is evidently a Daniell burner. The melting is evidently limited to the application of the oxygen, but no care is taken to see that this melting is restricted to produce a narrow kerf. One bolt might be so cut as to follow exactly the application claimed by Jottrand. Another bolt might be melted off, and be plainly an application of the Menne process.

Another difficulty which arises upon the plaintiff's theory of the case is presented in the article by Mr. Kindl (Proceedings of the Engineers' Society of Western Pennsylvania, November, 1915), in which armor plate cutting is described as an application of the Menne process, with a torch resembling the Daniell burner, and without the uniform tube shown in the Menne patent as the oxygen orifice. This method described by Mr. Kindl is said by the plaintiff's witnesses to be Jottrand. It might be one in one instance, and the other in a second instance, if the processes are to be held patentable according to the lines of the plaintiff's contention herein.

The claims of the Jottrand patent are as follows:

"1. The method of cutting plates, pipes and other metal articles consisting in heating the object to be cut and directing upon the heated part an oxidizing jet.

"2. The method of cutting plates, pipes and other metal articles consisting in directing upon the object to be cut a suitable heating jet and an independent oxidizing jet.

"3. The method of cutting plates, pipes and other metal articles consisting in directing a heating jet upon the object to be cut, upon the line of section and an independent oxidizing jet at a distance from the heating jet and displacing both jets along the line of section.

"4. The method of cutting plates, pipes and other metal articles consisting in directing a heating jet upon the object to be cut, along the line of section so as to raise the metal to a temperature enabling oxidation without fusion of the metal and in directing simultaneously upon the heated part of the object a jet of oxygen under pressure.

"5. The method of cutting plates, pipes and other metal articles consisting in directing a heating jet upon the object to be cut, along the line of section so as to raise the metal to a temperature enabling oxidation without fusion of the metal, in directing simultaneously a jet of oxygen under pressure upon the heated part of the object and in moving simultaneously both jets along the line of section."

It will be noticed that claim 1 is limited to "cutting plates, pipes and other metal articles." Claim 2 substitutes only the words "directing upon the object to be cut a suitable heating jet" for the words "heating the object to be cut." Claim 3 adds the words "upon the line of section" to the application of the heating jet, and then suggests moving the two jets "along the line of section." Claim 3 might be distinguished from the defendant's structure by its requirement that the oxygen jet be "at a distance from the heating jet." But this is a distance which is evidently implied in the other claims. Claim 4

brings in the idea of limiting the initial heating to a point at which oxidation without fusion may occur. Claim 5 is the same as claim 4, but with the obvious provision that the two jets shall be moved simultaneously along the line of section.

The previous discussion makes it plain that Jottrand intended to describe a method of cutting, in correspondence with claim 5, and that, in so far as claims 1, 2, 3, and 4 are broader than claim 5, they cannot include anything more with which we are concerned, and cannot avoid anticipation by the Menne patents and address, except as claim 5 specifically covers the Jottrand development.

Greater objection from the standpoint of validity might be urged against claim 1 than against any of the other claims, unless we construe claim 1 as substantially limited by the specifications and drawings to the various matters set forth in claim 5. Claims 1, 2, 3, and 4 therefore would be invalid unless limited to a *"cutting"* in the sense described in the specifications, rather than a mere severance by melting, from the application of an oxidizing jet to a heated surface. It would be impossible to hold claims 1 to 4 valid, in a broad sense, over the Menne patents and prior art as set forth in the Menne address, or even over the disclosures of the Hare blowpipe, the Daniell burner, and the Fletcher application.

Menne shows a suitable heating jet and independent oxidizing jet, as set forth in claim 2, and if Menne's process was being used to make a cut, the jets would be displaced along the line of section, as provided in claim 3. In the same way, claim 4 could not be used for the purpose of cutting, unless there were movement along the line of section, and we therefore find the Jottrand patent dependent upon claim 5, as the exact statement of that which is set forth in the specifications and drawings and upon which Jottrand seeks to avoid infringement of the mere melting method of severance made plain by Menne.

According to the undisputed testimony, when following the Jottrand claims, some heat produced by oxidation actually melts a greater or less portion of the metal which has not yet been oxidized. In practice, according to the testimony, a fixed adjustment is secured both as to quantities and pressure, through the skill of the operator, while a feeding device prevents deviation and thus confines the line of melting to the so-called cut. If a person follows carelessly claim 5 of the Jottrand patent, he might fail in his experiment and stop oxidizing the material, with a corresponding cessation of melting, he might melt so much that the cut would be enlarged into a Menne melting through, or he might turn on so much oxygen, without cooling down the metal, that the material would be melted in all directions. In any of these cases he would not be carrying out successfully the Jottrand directions, and it does not seem that patentability, in the sense of invention, should depend upon success in manipulation.

Jottrand does not get beyond the limits of the Menne disclosures by using an oxygen jet or pencil, which is not the free flow of oxygen from a pipe under pressure. A fine stream from the end of a jet will produce the same result as that from a uniform, but still narrow, pipe, emerging under possibly greater pressure but with less velocity. If

the difference is merely in the quantity of material available, no patentable invention would be presented in furnishing the quantity by one means rather than the other. But the plaintiff contends that the jet of oxygen produces a different result than the same quantity of oxygen supplied at exactly the same points by a straight tube.

The plaintiff further contends that Jottrand discloses appreciation of this difference and that Menne does not. But this claim presupposes that Menne, through his endeavor to melt as much as possible, did not understand and did not disclose the effect of limiting the supply of oxygen so as to limit the amount of iron oxide, and to avoid melting of the material outside the range of oxidation. Menne, of course, when he advocated the use of a stencil and interference with oxidation, intended to limit the amount of melting to such material as might be oxidized or melted within the lines of his stencil or plate.

It is impossible to hold that Jottrand could avoid anticipation by Menne if he stood solely upon the accuracy of adjustment by which oxidation alone could be accomplished with no melting. In fact, the plaintiff's own operators do cause some melting, as has been stated. The plaintiff is driven, therefore, to the proposition that Jottrand escapes the defense of anticipation by the Menne disclosure, solely through using a narrow orifice producing a jet of oxygen, instead of a uniform pipe with the stream of oxygen directed against a small portion of the surface, or against a stencil which would have the effect of a gate, and would produce thereby, so far as the results are concerned, a clumsy substitute for a nozzle.

Another defense must be considered, which took up the greater part of the testimony on the trial of the case. It proved to be an interesting issue. One Harris, living in Cleveland, is shown to have been active in the invention, manufacture, and use of so-called acetylene blowpipes and burners from the year 1901 on. Up to the year 1904, or the early part of 1905, he was actively interested in the manufacture and attachment of these acetylene burners to gas cooking ranges. He has shown by a number of witnesses that prior to 1905 he used oxygen which he produced by his own manufacture in actually cutting iron straps and in melting off the ends of pieces of iron such as the ordinary work bench file, through the use of an oxyacetylene blowpipe, to which he attached by wire a separate tube terminating in a nozzle, in order to supply an additional jet of oxygen after heating the material with the blowpipe. He has produced as an exhibit the instrument which he alleges was the one used by him in this way, which answers in general to the Jottrand torch.

Some dispute has been raised as to the possibility of producing oxygen, by Harris, of a quality which would do the work of cutting. Doubt has been cast upon the date at which some of the various witnesses saw Harris do what apparently constituted acts of cutting, according to the method described by Jottrand. But it is clearly shown that Harris did cut metal and operate the blowpipe in question before the date of the Jottrand invention. One piece of metal, attached to a stove sold by Harris at least as early as 1904, traced to a hardware firm in Iowa, and from them to a customer, who turned it over to the

defendant's representative, has been sufficiently identified so that the date of its original construction seems beyond dispute. Doubt has been thrown upon the carefulness with which the parts of this stove were protected prior to bringing them into court, but no satisfactory evidence has been shown to indicate tampering therewith. Analyses by one of the expert witnesses for the defense, accompanied by microscopical examination, with photographic enlargements of the edges of the cut at one end of the strap in question, seem to show a cut in which iron oxide was formed by the application of heat and oxygen, and in which the metallic particles upon the sides of the cut do not bear indication of melting such as would be the result of intense heat other than that by the cutting oxyacetylene torch. The bending and distorting physical changes following the use of a tool to sever the metal when cold or slightly heated are absent.

The testimony of this expert was exceedingly interesting, as was that of the other experts with relation to this particular exhibit. Much testimony was introduced by both sides in reference to the peculiar entries in certain books, which would seem to throw doubt upon the accuracy of recollection of the witness Harris and the other witnesses for the defendant who testify as to the date of Harris' experiments. The cost of oxygen here enters into the case as an evident reason why Harris did not pursue his development of a cutting torch; but it is apparent that Harris (who took out many patents for oxyacetylene heating blowpipes) did not, even though his use was public, progress beyond the stage of experiment, and did not understand or appreciate what he was doing, so as to constitute a public prior use of a method applying more than an accidental variation of the blowpipe of the prior art. He states that he made the blowpipe with the additional tube, for the supply of material to the blowpipe flame in the manufacture of artificial rubies. This extra material was a powder, which he thus fed into the flame. He took this blowpipe for the purpose of introducing oxygen as he would with a so-called "rat-tail burner," with the thought that this might prevent the production of long carbon filaments which formed from "polymerization" and broke off in the burner. The result was worse than before, and he transferred the flame to a piece of metal in order to test its melting or welding qualities. He found that it produced an incandescent spot, which punched a hole and cut off the material. He evidently always treated this as a mere variation in the form of a blowpipe flame, which created a melting heat, and never thought of the oxidizing, except as incidental to the flame of the oxyacetylene blowpipe. He treated it as an impractical and laboratory experiment, which led to no commercial use. His cutting was confined to the giving of laboratory illustrations of how he could melt with an oxyacetylene blowpipe, or to incidental cuts with an implement which was not an object of thought, except that it happened to be convenient at the time and was entirely abandoned when he proceeded to further develop his work in acetylene burners and blowpipes. It never rose to the dignity of an invention, nor even to the point of a definite, intelligent use of a device, as dis-

tinguished from the purely accidental employment of a convenient object. Wood Paper Patent, 90 U. S. (23 Wall.) 566, 23 L. Ed. 31.

[4] The defendant has attacked the title of the plaintiff, and one or two matters in that connection must be referred to. The original assignment to this plaintiff, although admittedly recorded in the office of the Commissioner of Patents, could not be produced at the trial. There seems to be no reason to find that the existence and contents of the original were not sufficiently proven, and the title of the plaintiff is thus traced back to an assignment from the heirs and legal representatives of the inventor, who died in Belgium on May 4, 1907. It appears from the record that the legal representatives (or those succeeding to the personal property in the estate of Jottrand, deceased), according to the law of Belgium, made in writing and delivered an assignment of the patent in suit, and of certain applications for other United States patents, to the Société Anonyme l'Oxhydrique Internationale, a Belgian corporation. It is shown by the testimony that no letters of administration are needed in Belgium, and that those entitled take without formality. Similarly no certificate of such rights, from any legal tribunal, is needed to make prima facie title; but the parties conveying prove their right by executing under oath a paper showing their succession to that title. The Belgian law requires this paper to be sworn to before a "notaire," and it thus stands as a judicial record. In the case in question, this paper, which was worded in compliance with the laws of Belgium, and was signed by those required to make it valid to pass title in Belgium, was not proven before a "notaire," but actually executed before the American consul, in order to make it equivalent to an acknowledgment under the United States law. Section 4898, R. S., as amended by chapter 391, § 5, Act March 3, 1897, 29 Stat. 692 (Comp. St. 1913, § 9444). As those who under Belgian law could convey title thus executed an instrument sufficient to pass title in the United States, for the purpose of assigning patent rights in the United States, the objection that it was not so verified as to prove itself in a Belgian court is of no moment. Title would pass by the writing, and the proof thereof is sufficient for its recording and use as evidence in the United States. Subsequently the Société Anonyme executed a conveyance, valid in form, to an American corporation, which through various further assignments passed on the title to the plaintiff.

This assignment by the Société Anonyme was executed also by Herman W. Falk and Henry Harnischfeger, who were stockholders and officers of the grantee (this American corporation). By this instrument Falk and Harnischfeger assigned to this corporation all rights and demands to damages and profits from any infringement of said letters patent. An earlier instrument, purporting to be a contract and provisional assignment to Falk and Harnischfeger from the Société Anonyme and recited in the assignment to the American corporation, was offered in evidence and excluded upon objection by the defendant. It apparently conveyed title only conditionally until the actual grant to the American corporation could be obtained. Even if received in evidence, it would have left no title in the grantees after per-

formance of the condition divesting them of that title and the release of any rights thereunder by their own admissions in the evidence. Their joinder in the later contract with implied release of all claims or rights thereunder, and the oral proof by Falk and Harnischfeger to the same effect, sufficiently show that no legal title, even to the letters patent, remained in Falk and Harnischfeger after expiration of the original conditional grant. But the exclusion of the paper, upon objection by the defendant, makes it unavailable to the defendant for any purpose.

The defendant alleges that the plaintiff is seeking to compel the use of its own torches or of oxygen sold by it through control of the Jottrand method patent. That there is actually any illegal restraint of trade or creation of monopoly, through threat of prosecution for contributory infringement, does not seem to have been proven. An improper limitation of license to use of the patent, to those customers who buy a certain product, has not been shown. The patent question in the case seems to have been kept clear of the Clayton Act (Act Oct. 15, 1914, c. 323, 38 Stat. 730). But the decision of invalidity makes these matters immaterial, and the answer did not urge this defense, which is clearly an afterthought, or makeweight, which should not be carelessly thrown into the decision.

Nor does the suggestion of acquiescence by the implied license, which was continued so long as the defendant bought oxygen from the plaintiff, make out a defense against the charge of infringement after the so-called license was terminated. Infringement would be found if the method patent were to be held valid; but as this patent does not show invention over the prior art, and must be held anticipated as previously indicated, decision will be given for the defendant, and decree may be entered accordingly.

### On Settlement of Decree.

[5] The plaintiff asks the court to include a separate finding or decree as to each defense which was found in the plaintiff's favor, and which was therefore disregarded in giving judgment for the defendant. This decision for the defendant was based upon the defense of invalidity. On appeal, a reversal of the decree would result in a new trial, a further hearing in the Court of Appeals, or a final determination as to the remaining issues upon the present record. The defendant cannot appeal from a decree in its favor, nor can this court give judgment for the plaintiff upon the issues which, so far as this case is concerned, are found in the plaintiff's favor. The decision, in so far as it has a part in the decree, should be embodied only by reference or recital.

A decision for the plaintiff, with findings of validity and infringement by the defendant, would have presented two matters as to which error could be assigned. In Thacher v. Transit Construction Co., 234 Fed. 640, —— C. C. A. ——, the defendant assigned error only as to the finding of infringement, and the court did not consider on appeal his argument that the patent was, after all, invalid. The form of decree was not involved, and the defendant, if he had attacked the finding

of validity as well as infringement, could have had both matters considered upon the printed record in the Court of Appeals.

But, with decree for defendant, it would not be fair to the plaintiff or to the Court of Appeals to render adjudication upon issues which could not be tested by appeal and which the upper court should not be asked to go into, unless a new trial be had either in the upper court or in this court, after a reversal of the finding upon which decree went for the defendant. In the latter case either side should have the opportunity of presenting the issues with any newly discovered evidence, and neither party should be finally bound, on a new trial or in any *other* action, by a so-called adjudication as to issues not reviewable by the Court of Appeals. If several patents are included in one action, the decree may be for the plaintiff on one patent and for the defendant on another; but as to each patent the decree must be an entirety, covering the issues which control the granting of the decree.

It is suggested that the court should not "hesitate to put in the succinct form of a decree the findings so laboriously reached in a voluminous opinion upon protracted consideration of a voluminous record," and that this "form has the advantages of accuracy, of clarity, and of definiteness—all of great moment in the Court of Appeals and of substantial importance elsewhere. The other form is meaningless, unless its premises and conclusions be searched out of other parts of the record." The court recognizes these premises and the desirability of briefly summarizing the opinion. But the decree is essentially the judgment which disposes of the case, instead of being an index or compendium of the various points which the court has considered.

The decree should order and adjudge only the determination of the controversy.